IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHARLES SHUMANIS, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 14-6560 |
| | : | |
| v. | : | |
| | : | |
| LEHIGH COUNTY, WARDEN DALE | : | |
| MEISEL, WARDEN JANINE DONATE, | : | |
| SERGEANT ERIC SABORSKY, | : | |
| CORRECTION OFFICER RONALD | : | |
| MARCH, and CORRECTION OFFICER | : | |
| ERIC NOWICKI, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

Smith, J.                                                                                        March 29, 2016

This is a civil action under 42 U.S.C. § 1983 for alleged constitutional violations arising from an incident in November 2012 in which multiple inmates assaulted the inmate-plaintiff while they were inside of a county jail.  After the pleadings were closed, the defendants raised a claim that the plaintiff failed to exhaust his administrative remedies at the jail prior to commencing this litigation.  As the issue of exhaustion is a question of law for the court to determine, the court allowed the parties to engage in limited discovery on this issue.  After completing discovery, the defendants have moved for summary judgment, claiming that the evidence in the record shows that the plaintiff failed to exhaust his administrative remedies.  The plaintiff opposes the motion and argues that he did not have to exhaust any administrative remedies prior to filing suit because of the nature of his claim or, alternatively, he exhausted his administrative remedies because he filed an informal grievance and the jail policy did not

provide for a procedure requiring him to file a formal grievance once he received a response to his informal grievance.

After reviewing the record in the light most favorable to the plaintiff, as the party opposing the motion for summary judgment, the court finds that (1) the plaintiff was aware of the jail's grievance procedure, (2) he needed to exhaust his administrative remedies by grieving any issues concerning any improper conduct by jail staff because such action constituted grievable "staff action" under the jail's grievance policy, (3) the plaintiff did not file an informal grievance relating to the acts at issue, (4) even if he did file an informal grievance, the jail's grievance policy required inmates to file a formal grievance and proceed through any appeal from a denial of that grievance before the inmate's remedies are considered to be exhausted, and (5) the plaintiff failed to exhaust his administrative remedies because he admits that he never timely filed a formal grievance relating to the November 2012 incident at issue.  Accordingly, the court will grant the motion for summary judgment because there are no genuine issues of material fact as to whether the plaintiff exhausted his available administrative remedies at the jail and, as such, the defendants are entitled to have the court enter summary judgment in their favor.

## I.    ALLEGATIONS AND PROCEDURAL HISTORY

The plaintiff, Charles Shumanis, commenced this action by filing a complaint against the defendants, Lehigh County Jail (the "Jail"), Warden Dale Meisel ("Meisel"), Warden Janine Donate ("Donate"), Sergeant Eric Saborsky ("Saborsky"), Correction Officer Ronald March ("March"), and Correction Officer Eric Nowicki ("Nowicki"), on November 14, 2014. Complaint, Doc. No. 1.  In the complaint, the plaintiff alleges that on November 16, 2012, he was an inmate at the Jail.  *Id.* at ¶ 10.  While the plaintiff was in the Jail, there was a ten-year-old "no contact" order preventing him from having contact with another inmate named Roberto Diaz

("Diaz").  *Id.* at ¶ 11.  The no-contact order was in effect to protect the plaintiff because he had previously served as a witness against Diaz.  *Id.*

Jail personnel had brought the plaintiff into the administration and discharge room so he could complete paperwork to transfer him to state prison.  *Id.* at ¶¶ 10, 12.  While in this area, the plaintiff saw Diaz, but before he could react, Diaz and two other individuals brutally attacked him.  *Id.* at ¶ 12.  Despite being in the plaintiff's presence at the time of the attack, Saborsky, March, and Nowicki did not attempt to stop the assault because none of them had handcuffs.[1]  *Id.* at ¶¶ 12, 13.  As a result of the assault, the plaintiff suffered numerous injuries, including: blurred vision in his left eye, five lost teeth, a torn lip, a closed head/brain injury, dizziness, back pain, numbness in his right hand, subdural hematoma, dislocated mandible, permanent facial scar, left eye deformity, and mental and cognitive concentration issues.  *Id.* at ¶ 13.

Based on the aforementioned allegations, the plaintiff asserts claims under 42 U.S.C. § 1983 for violations of his rights under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.  *Id.* at 6, 8, 9.  In his requests for relief, the plaintiff seeks compensatory and punitive damages.  *Id.* at 7, 10.

The defendants filed an answer to the complaint along with affirmative defenses on January 13, 2015.  Doc. No. 3.  For their fourth affirmative defense, the defendants assert that "Plaintiff failed to exhaust his administrative remedy [sic].  Specifically, Plaintiff failed to take those steps required by the Prison Litigation Reform Act, 42 U.S.C.[] § 1997e and he is therefore barred from suit."  Answer with Affirmative Defenses to Pl.'s Compl. at 6.

The court held an initial pretrial conference with counsel on March 13, 2015.  During the conference, the defendants indicated that they had significant evidence that the plaintiff failed to exhaust his administrative remedies prior to filing suit in this case.  As such, the court entered a

---

[1] The plaintiff also asserts that these defendants "condon[ed]" the attack on the plaintiff.  Complaint at ¶ 13.

scheduling order on March 16, 2015, allowing the parties engage in limited discovery on the exhaustion of administrative remedies and then potentially move for summary judgment thereafter.[2]  *See* Scheduling Order, Doc. No. 6.

The defendants filed a motion for summary judgment and supporting memorandum of law on May 19, 2015.  Doc. No. 9.  The plaintiff filed a reply to the motion with a supporting memorandum of law on June 11, 2015.  Doc. No. 10.  The court heard oral argument on the motion on July 23, 2015.  The motion is ripe for disposition.

## II.    DISCUSSION

### A.    <u>Standard – Motion for Summary Judgment</u>

A district court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Additionally, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Wright v. Corning,* 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. New Jersey State Police,* 71 F.3d 480, 482 (3d Cir. 1995)).  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id.*

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it

---

[2] The court also provided the plaintiff with a period of time to file an amended complaint.  *See* Scheduling Order at ¶ 1.  On March 31, 2015, the parties entered into a stipulation by which Lehigh County was essentially substituted as a party for Lehigh County Jail.  *See* Amended Compl. and Answer by Stipulation, Doc. No. 7.

believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the moving party has met this burden, the non-moving party must counter with "'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citation omitted); *see* Fed. R. Civ. P. 56(c) (stating that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . .; or . . . [by] showing that the materials cited do not establish the absence . . . of a genuine dispute"). The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production. *Anderson,* 477 U.S. 242, 252 (1986). Bare assertions, conclusory allegations, or suspicions are insufficient to defeat summary judgment. *See Fireman's Ins. Co. v. DuFresne,* 676 F.2d 965, 969 (3d Cir. 1982) (indicating that a party opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions"); *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999) (explaining that "speculation and conclusory allegations" do not satisfy non-moving party's duty to "set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor"). Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Moreover, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Township of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter,* 476 F.3d 180, 184 (3d Cir. 2007).  The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should grant summary judgment in favor of the moving party.  *Matsushita Elec. Indus. Co.,* 475 U.S. at 587 (citation omitted).

## B.     Factual Record

### 1.     The Jail's Grievance Policy

Edward Sweeney ("Sweeney") has served as the Director of Corrections for the Jail since 1999.[3]  Motion for Summ. J. of Defs., Lehigh Cnty. Jail, Dale Meisel, Janine Donate, Eric Saborsky, Ronald March, and Erick Nowicki ("Defs.' MSJ") at Ex. H, Aff. of Edward Sweeney in Supp. of Defs.' Mot. for Summ. J. ("Sweeney Aff.") at ¶¶ 1, 3.  The Jail has had a Grievance Policy and Procedure ("GPP") since the policy's implementation in 2007.  Sweeney Aff. at ¶ 4.  The GPP was revised on or about November 21, 2012, to include a section dealing with emergency grievances and a section pertaining to grievance rejections.[4]  *Id.* at ¶¶ 7, 9 & Ex. A.  Neither of these changes "have any bearing on the issues that are the subject of th[is] lawsuit." *Id.* at ¶ 11.

---

[3] Although it appears that the official designation of the facility is the "Lehigh County Jail," Sweeney refers to the facility as the "Lehigh County Prison" and other documents in the record do the same.  For consistency, the court will continue to refer to Lehigh County's correctional facility as the Jail.

[4] Sweeney also stated that "[i]n all other respects, the GPP remained unchanged after the revision of November 21, 2012."  Sweeney Aff. at ¶ 8.  The court has reviewed both policies and this statement is incorrect as there appear to have been additional changes to the GPP, but those changes do not affect the substance of the provisions that are pertinent to the court's analysis of the plaintiff's claims in this case and neither party has argued as such.  Occasionally, the court will reference a change to the GPP for sake of completeness.

With regard to the inmate grievance policy, the Jail "provide[d] inmates with an administrative means for the expression of, and for the prompt review and resolution of, inmate problems and concerns."  *Id.* at Ex. A, Inmate Grievance Policy Effective May 1, 2009 ("IGP") at 1.[5]  The GPP indicates that the rationale for the grievance policy is:  "Providing a structured forum for inmates to bring forward issues and complaints about their confinement enhances security, gives accountability to the system and encourages positive communication."  IGP at 1.

The GPP defines a "Grievance" as "[a] complaint by a present or former inmate and consisting of one claim, issue or problem affecting that inmate and which is addressable under [the] policy."  *Id.*  Inmates can file informal or formal grievances under the GPP.  *Id.* at 1-2.  A "Formal Grievance" is "[a] grievance written on [the Jail's] multi-part 'Inmate Formal Grievance, Part I' form."  *Id.* at 1.  An "Informal Grievance" is "[a] grievance for which resolution is attempted with facility staff either verbally, or in writing via an 'Inmate Request to Staff.'"  *Id.* at 2.

The following "issues are grievable, either informally or formally," under the GPP:  "Classification[;]  Food Service[;]  Housing Unit operations[;]  Inmate accounts[;]  Library access[;]  Medical access[;]  Program access[;]  Property (secured)[;]  Staff actions[;]  Telephones (non-collect)[;  and]  Visitation."  *Id.*  The following issues are not grievable under the GPP:  "Collect phone system (separate process)[;]  Informal Resolution Reports[;]  Housing unit or cell assignment[;]  Judicial decisions[;]  Mail/books  (separate  process)[;]  Misconducts/appeals (separate process)[;]  Probation/parole issues[;]  Property, issued (separate process)[;  and] State and federal laws."  *Id.*  According to Sweeney, "[a]n alleged failure to keep identified and

_____

[5] Because the amendment to the GPP did not alter the substance of the relevant grievance provisions for purpose of the court's analysis here, the court will refer only to the version of the GPP that was in effect at the time of the November 16, 2012 assault.

reported enemies separated constitutes a grievable issue under the GPP as it pertains to 'staff actions.'"  Sweeney Aff. at ¶ 14.

The GPP provides that an inmate must attempt to first resolve a grievable issue through an informal grievance.[6]  IGP at 3.  The inmate can submit an informal grievance verbally or in writing, but if the inmate submits an informal grievance in writing, the Jail staff must answer it within 14 days after receiving it.  *Id.*  If the inmate is "unable to resolve the grievance informally, he may submit a formal grievance."  *Id.*  Also, "[i]f the inmate does not hear back from the staff member, any formal grievance submitted must still meet the submission deadline spelled out below."  *Id.*  Regarding the timing for filing a formal grievance, the inmate must file a formal grievance "no later than 21 calendar days from the event that triggered the grievance."  *Id.*  The inmate must "complete all required parts of the 'Inmate Formal Grievance, Part I' form" when initiating a formal grievance.  *Id.*

All formal grievances are forwarded to the Grievance Coordinator.[7]  *Id.*  If the Grievance Coordinator accepts the grievance, *i.e.* it was submitted in accord with the GPP, he or she "shall assign the grievance to an appropriate staff member for investigation and response."[8]  *Id.* at 4.  The staff shall complete the response "no later than 15 calendar days from the Grievance Coordinator's receipt of the formal grievance" and use an "'Inmate Formal Grievance, Part II'" form when responding to the inmate.  *Id.*  If dissatisfied with the response to the formal grievance, the inmate "may appeal a . . . formal grievance decision to the Warden."  *Id.*  The GPP provides that "[t]his is the only appeal available.  At the conclusion of the appeal,

---

[6] The GPP also provides that "[f]ailure to attempt to resolve an issue informally is grounds for rejecting a formal grievance."  IGP at 3.

[7] The GPP defines the "Grievance Coordinator" as "[t]he [Jail] staff member charged with managing the Formal Grievance process, including the logging, tracking, reviewing and data collection of these grievances."  IGP at 1.

[8] In the November 21, 2012 revised GPP, the Grievance Coordinator could also "investigate and prepare the response."  Sweeney Aff. at Ex. B, Inmate Grievance Policy Effective November 21, 2012 at 4.

administrative remedies will have been exhausted." *Id.* The Warden (or in the Warden's absence, the Warden's designee) must "render a written decision within 15 calendar days of the receipt of the appeal." *Id.*

The GPP provides that "[a]n inmate shall exhaust all administrative remedies contained in this policy before filing a civil suit over the grievance." *Id.* at 3. The GPP also defines the "Exhaustion of Administrative Remedies" as

> [t]he process under [the] PLRA (specifically 42 U.S.C. §1997e(a)) which requires an inmate to complete an administrative review of an issue, to include following procedural rules and meeting established deadlines, as a pre-condition to bringing suit over the issue in court. This policy outlines the proper administrative remedies and establishes those procedural rules and deadlines.

*Id.* at 1.

According to Sweeney, "[i]n 2012, inmates entering [the Jail] would be given a handbook which included, among other things, an explanation of the GPP." Sweeney Aff. at ¶ 12. The inmates also would have had inmate grievance forms available on every residential block in the Jail. *Id.* at ¶ 13.

### 2. The Plaintiff's Knowledge and Use of the Jail's Grievance Policy and Activity Related to the November 16, 2012 Assault

The plaintiff has been incarcerated at the Jail on multiple previous occasions. Defs.' MSJ at Ex. A, Requests for Admission of Defs. Addressed to Pl., Charles Shumanis ("RFA") at ¶ 5, Doc. No. 9-3; Defs.' MSJ at Ex. B, Pl.'s Answers to Request for Admissions ("RFA Answers") at ¶ 5, Doc. No. 9-4.[9] Through his past experience as an inmate at the Jail, the plaintiff was aware that the Jail had an inmate grievance procedure. RFA at ¶ 4; RFA Answers at ¶4. The plaintiff believes that "the [grievance] process was to allow prisoners to make aware the prison

---

[9] The plaintiff also attached a copy of his answers to the requests for admissions to his memorandum in opposition to the motion for summary judgment. Plaintiff's Mem. of Law in Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Mem.") at Ex. A, Doc. No. 10-3.

administration of problems/issues which arise which they/it were not aware so that the Prison/administration could take corrective action."  RFA at ¶ 4; RFA Answers at ¶ 4.

On October 4, 2012, the plaintiff filed an inmate formal grievance regarding the processing of a sick call request.[10]  RFA at ¶¶ 6, 7 & Ex. B; RFA Answers at ¶¶ 6, 7.  In this formal grievance, the plaintiff claimed that the shift nurse failed to process two sick call slips that he had filed.[11]  RFA at ¶ 7 & Ex. B; RFA Answers at ¶ 7.  On October 18, 2012, Jail staff responded to the grievance.  RFA at ¶¶ 8, 9 & Ex. C; RFA Answers at ¶¶ 8, 9.

The plaintiff filed an informal grievance to "Deputy Warden of Treatment (Donate)" on or about November 30, 2012.[12]  Pl.'s Mem. at Ex. I, Informal Grievance, Doc. No. 10-11.  In the informal grievance, the plaintiff, *inter alia*, (1) complains about being on "A/S" status even though he did not receive a misconduct or break any facility rules or regulations with respect to the incident on November 16, 2012,[13] (2) states that he has not been able to contact anyone from outside of the Jail or speak to anyone about what happened, (3) asks: "[S]houldn't I be speaking with Internal Affairs?"; (4) requests to be taken "off A/S status so [he] can at least buy a stamped envelope to mail something to someone who cares[;]" and (5) requests a response "as to why these actions have been taken yet not explained to me."  *Id.*

It appears that Deputy Warden Donate responded to the informal grievance on November 27, 2012.  *Id.*  In the response, she indicated that she "was not aware [he was] being restricted &

---

[10] It appears that the plaintiff signed the grievance on October 3, 2012, but the Grievance Coordinator received it on October 4, 2012.  RFA at Ex. B.

[11] The plaintiff indicated that he filed the grievance to "let Medical Administration (Head of Medical) know the medical staff to whom he complained were not properly handling his illness, so that something could be done about it."  RFA Answers at ¶ 6.

[12] While ultimately irrelevant for purposes of resolving the instant motion, the plaintiff's dating of this informal grievance appears to be incorrect insofar as it appears that the plaintiff dated the grievance on November 30, 2012; yet, Deputy Warden Donate appears to have dated her response on November 27, 2012.  Pl.'s Mem. at Ex. I, Informal Grievance.

[13] Although the plaintiff does not specify it as such, the court reasonably infers that the plaintiff is referring to the November 16, 2012 assault based on a review of the totality of this informal grievance.  In this regard, the plaintiff appears to reference the assault on November 16, 2012 when he states that "it has been 9 days now since this incident in question."  Pl.'s Mem. at Ex. I, Informal Grievance.

not using the phone etc." *Id.*  She further stated that she would "have [his] status updated [and she did not] know anything about internal affairs." *Id.*

The plaintiff filed a formal grievance on December 13, 2012.[14]  RFA at ¶¶ 10, 11 & Ex. D; RFA Answers at ¶¶ 10, 11.  In this grievance, the plaintiff claimed that he was not given clean clothing for five straight days despite his requests for new clothing on three consecutive days. RFA at ¶ 11 & Ex. D; RFA Answers at ¶ 11.  The plaintiff notes in the formal grievance that he finally received new clothing after the fifth day.  RFA at Ex. D.  The Jail staff responded to the plaintiff's grievance on December 27, 2012.  RFA at ¶¶ 12, 13 & Ex. E; RFA Answers at ¶¶ 12, 13.

The plaintiff filed another formal grievance on December 28, 2012.[15]  Pl.'s Mem. at Ex. C, Formal Grievance, Doc. No. 10-5.[16]  In this grievance, the plaintiff claims that on December 22, 2012, a correctional officer Schraer ("Schraer") filed a "bogus" misconduct report in which he lied about what occurred during a cell search.  *Id.*  Apparently, Schraer claimed that he had to use force to stop the plaintiff from lunging at another correctional officer, Sergeant Sterz.  *Id.* The plaintiff asks the Jail staff to review the tapes from that date and time as the recording would prove Schraer's allegations false.  *Id.*  The plaintiff also states that the false allegations were a "calculated retaliation to [his] prior grievance about Sgt. Sterz that Deputy Warden Donate had talked to him about."  *Id.*

---

[14] As noted by the plaintiff in his answers to the requests for admissions, the date in the request is incorrectly noted as "December 13, 2013," because the Grievance Coordinator received the grievance on December 13, 2012.  RFA at Ex. D; RFA Answers at ¶¶ 10, 11.  Also, it appears that the plaintiff signed the grievance on December 9, 2012, but the Grievance Coordinator did not receive it until December 13, 2012.  RFA at Ex. D.

[15] Unlike the plaintiff's other formal grievances introduced as part of the record, this written grievance does not contain a date next to the plaintiff's signature.  Nonetheless, the Grievance Coordinator received it on December 28, 2012.

[16] Unfortunately, the copy of the plaintiff's memorandum of law entered on the Electronic Case Filing system does not contain exhibit tabs for the plaintiff's exhibits.  Nonetheless, the court has referred to the exhibits as the plaintiff does in his memorandum of law.

On January 11, 2013, the plaintiff received a response to his December 28, 2012 grievance. Pl.'s Mem. at Ex. D, Grievance Response, Doc. No. 10-6. The response indicated that the Grievance Coordinator rejected the grievance because "misconducts are not grievable." *Id.* The plaintiff then appealed from the Grievance Coordinator's denial to the Warden on January 19, 2013. Pl.'s Mem. at Ex. E, Grievance Appeal, Doc. No. 10-7. The Warden denied the appeal on February 1, 2013. Pl.'s Mem. at Ex. F, Grievance Appeal Denial, Doc. No. 10-8. In denying the appeal, the warden noted (1) the Grievance Coordinator properly rejected the grievance, (2) he had reviewed the available evidence and could not find support for the plaintiff's claims, and (3) the plaintiff did not suffer an injury because he was transferred out of the Jail before the misconduct was heard. *Id.*

The plaintiff denies being in possession of a grievance procedure handbook or written rules and regulations. RFA at ¶ 14; RFA Answers at ¶ 14. Nonetheless,

> he was familiar with the existence of the grievance process whereby the inmate (such as [the] plaintiff) could ask a Corrections Officer (C.O.) to take some action or he could ask the C.O. to give him a grievance form to file a formal request. If he wrote a formal request he would put it in the Request Slip box on the block unless he was in the medical unit. If he was in the medical unit it would be deposited in the request slip box by the medical C.O. to whom he gave the grievance.

RFA Answers at ¶ 14.

The plaintiff claims in the complaint that the incident at issue in this case occurred on November 16, 2012. Sweeney Aff. at ¶ 16; RFA at ¶ 2; RFA Answers at ¶ 2. The 21-day period for filing a formal grievance relating to the incident would have expired on December 7, 2012. Sweeney Aff. at ¶¶ 16-17. The plaintiff never filed a formal written grievance concerning the

issues raised in his complaint prior to commencing this action.[17]   Sweeney Aff. at ¶¶ 18, 19;

RFA at ¶ 16; RFA Answers at ¶ 16.

In his response to the defendants' requests for admissions, the plaintiff denies having

never filed any grievance for the following reasons:

> First, a written grievance is irrelevant in a fully witnessed and reported incident. There would be no reason to file a written grievance since the assault happened in front of multiple C.O.s who witnesses [sic] the assault, reported the same, had criminal arrests made of the perpetrators, and who arranged transport of the injured victim (Plaintiff) to the hospital.  Further, there is a video recording of the assault on record which is a recording of the actions or inactions complained about in the civil action pending.  Plaintiff made an informal grievance in accordance with the policy as per Exhibit "F" attached hereto.  The informal grievance consisted of him being questioned and giving a statement to investigators and prison officials.  Plaintiff was asked to press charges by the Defendant Lehigh County by its County Detectives against the perpetrators of the assault.  The County Detectives recorded his complaint and relevant facts as to how and why the assault happened, including the "no contact" order in existence before the assault which was ignored by the prison employees, including named Defendants.  The County Detectives acknowledged to him there was a no contact order in existence between him and one of the perpetrators prior to the assault, and that a video of the assault [sic].  Therefore, it is **DENIED** no informal grievance was made, which is irrelevant in this type of case anyway, since the County Detectives recorded his grievance.  Finally, Plaintiff through his counsel sent notice of the events pursuant to the Political Subdivision Tort Claim[s] Act notice requirement Exhibit "H" and a letter to the investigating Detective, Exhibit "I" attached hereto.

RFA Answers at ¶ 16.

With regard to the notice under 42 Pa. C.S. § 5522, the plaintiff attached the notice to his

answers to the requests for admissions.  RFA Answers at Ex. H.  The notice is dated on

December 19, 2012, and states as follows:

> Please be advised that I have been asked to represent Charles Shumanis in an injury claim against Lehigh County Prison and/or employees of Lehigh County arising out of an injury on November 16, 2012.  Mr. Shumanis was severely beaten by fellow inmates in Lehigh County Prison.  Mr. Shumanis was allowed to suffer this beating notwithstanding a separation order being in place that required

---

[17] The plaintiff did file a formal grievance as of the date he filed his response to the requests for admissions.  RFA Answers at ¶ 16 & Ex. G.

him to not be allowed to come into contact with Robert Diaz, one of the perpetrators in the beating.  It is my understanding that Mr. Diaz and two other inmates attacked Mr. Shumanis on November 16, 2012 and inflicted severe injuries causing him neurological, orthopaedic and dental injuries which required hospitalization and that he is still suffering form [sic] these injuries.  The medical information is within the control of the Lehigh County Prison but it is my understanding that Mr. Shumanis was initially taken to St. Luke's Hospital in Allentown and then transferred to St. Luke's Hospital in Bethlehem.  It is also my understanding that Dr. Wilson, who is employed by the prison system, also saw him in prison.  My understanding is that the beating was recorded on videotape and I am requesting that the videotape be preserved as well as any other documentation or physical evidence for later review.

Please have your Solicitor and/or representative contact me to discuss this matter.

*Id.*

### 3.   Additional Information Related to the Incident on November 16, 2012

Jail personnel completed misconduct reports charging each of the three individuals involved in assaulting the plaintiff on November 16, 2012 with misconducts.[18]  Pl.'s Mem. at Ex. G, Misconduct Reports, Doc. No. 10-9.  In addition, Saborsky prepared an incident report based on the altercation.  Pl.'s Mem. at Ex. H, Incident Report, Doc. No. 10-10.  In the incident report, Saborsky described his participation in and observations of the incident on November 16, 2012, and noted, *inter alia*, that the plaintiff "informed me that [one of the assailants] was listed as his enemy which led to the assault."  *Id.*  Saborsky also stated that he "spoke with Lehigh County Sheriff Deputy Focht and explained to him the entire situation."  *Id.*  The Commonwealth of Pennsylvania eventually brought criminal charges against Diaz and the two other inmates that assaulted the plaintiff.  *See* Pl.'s Mem. at Ex. B, Criminal Docket Sheets.

The plaintiff has produced three e-mail messages individuals exchanged that appear to be related to the incident on November 16, 2012.  In the first message, Cliff Knappenberger

---

[18] The charges included (1) disruption or interfering with the orderly running of the facility, (2) refusing a verbal or direct order, and (3) aggravated assault.  Pl.'s Mem. at Ex. G, Misconduct Reports.

("Knappenberger"), identified in the body of the e-mail as the Internal Affairs Investigator for the Lehigh County Department of Corrections, sent an e-mail on November 16, 2012, to three individuals looking for a copy of the video relating to "the code red that took place at the booking counter on 11/16/2012 at 0530 between Inmates Eric Rosario, . . . Rodolfo Hernandez, . . . Roberto Diaz, . . . and Chuck Shumanis, . . . for investigation." Pl.'s Mem. at Ex. J, E-mails, Doc. No. 10-12.  In the second message, Knappenberger appears to have sent an e-mail on December 10, 2012, to Sweeney and Meisel, in which he states:  "Ed Ressler is conducting an investigation concerning the Shumanis assault.  Usually, they wait until the inmate files a private criminal complaint form, but this time they begun the investigation after we sent them the reports."  *Id.*  In the third message, Knappenberger sent a message dated December 13, 2012, to Edward Ressler related to the "Shumanis Investigation," in which he appears to ask Mr. Ressler to "give us a 'heads-up' when you make an arrest(s) in the Shumanis investigation to allow Director Sweeney to be prepared for any press inquiries."  *Id.*

### C.   Analysis

#### 1.   The Parties' Arguments

In the motion for summary judgment, the defendants generally argue that the court should grant summary judgment in their favor because the plaintiff failed to exhaust his administrative remedies prior to filing this action.  The defendants argue that the GPP requires an inmate to file a formal grievance (and proceed through the necessary steps thereafter) to fully exhaust administrative remedies.  Memorandum of Law in Supp. of Mot. for Summ. J. of Defs., Lehigh Cnty. Jail, Dale Meisel, Janine Donate, Eric Saborsky, Ronald March, and Erick Nowicki ("Defs.' Mem.") at 8-9.  They assert that, contrary to the plaintiff's assertions in his responses to their requests for admissions, his issues with respect to the conduct of Jail staff on November 16,

2012, were grievable under the GPP because they related to "staff actions." *Id.* at 8. Despite being aware of the grievance procedure – as evidenced by the plaintiff's response to the defendants' requests for admissions and his grievances filed before and after the November 16, 2012 incident – the plaintiff failed to file a formal grievance within 21 days of the assault as required by the GPP. *Id.* at 5-8. The defendants contend that this failure to file a formal grievance unequivocally demonstrates that the plaintiff failed to exhaust his available administrative remedies. *Id.*

In response to the motion, the plaintiff contends that he did not need to exhaust any remedies with respect to the assault on November 16, 2012, or, alternatively, he exhausted his administrative remedies through his participation in the GPP's informal grievance procedure. Pl.'s Mem. at 3-13. With respect to the first contention, the plaintiff asserts that he did not need to grieve any issues pertaining to the assault because those issues involve "state and federal laws," which are not grievable under the GPP. *Id.* at 3-4. He also states that although the defendants are now asserting that "staff actions" are grievable under the GPP, he attempted to grieve a "staff action" about a month after the incident, but was repeatedly told it was not grievable.

Concerning the plaintiff's arguments that he exhausted his administrative remedies, he claims that he exhausted his administrative remedies by filing an informal grievance within 14 days of the incident and Donate responded to the informal grievance. *Id.* at 5-6. He asserts that he exhausted his administrative remedies because the GPP essentially provides two avenues for resolutions of grievances: the informal grievance avenue and the formal grievance avenue. *Id.* at 6-11. The plaintiff argues that because GPP does not provide a procedure when an inmate receives a decision on an informal grievance and states that an inmate "may" (instead of "shall")

file a formal grievance if the informal grievance is unresolved, he exhausted the administrative remedies available to him.

## 2.     Exhaustion of Administrative Remedies Under the Prison Litigation Reform Act

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The phrase "with respect to prison conditions" refers to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Exhaustion under the PLRA is mandatory.  *Woodford v. Ngo*, 548 U.S. 81, 85 (2006) (citing *Booth v. Churner*, 532 U.S. 731, 739 (2001)).  Section 1997e(a)'s mandatory exhaustion requirement promotes numerous and significant public policies, including:

> (1) avoiding premature interruption of the administrative process and giving the agency a chance to discover and correct its own errors; (2) conserving scarce judicial resources, since the complaining party may be successful in vindicating his rights in the administrative process and the courts may never have to intervene; and (3) improving the efficacy of the administrative process.

*Nyhuis v. Reno*, 204 F.3d 65, 75 (3d Cir. 2000).  Moreover,

> a comprehensive exhaustion requirement better serves the policy of granting an agency the opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court.  Moreover, even if the complaining prisoner seeks only money damages, the prisoner may be successful in having the [prison] halt the infringing practice or fashion some other remedy, such as returning personal property, reforming personal property policies, firing an abusive prison guard, or creating a better screening process for hiring such guards.  And when a prisoner obtains some measure of affirmative relief, he may elect not to pursue his claim for damages.  In either case, local actors are given the chance to address local problems, and at the very least, the time frame for the prisoner's damages is frozen or the isolated acts of abuse are prevented from recurring.

> An across-the-board exhaustion requirement also promotes judicial efficiency. . . . A prisoner may use the threat of money damages as a bargaining chip to obtain relief that he really wants, and may then be satisfied when he gets that relief from the prison.  Moreover, even if only a small percentage of cases settle, the federal courts are saved the time normally spent hearing such actions and multiple appeals thereto.
>
> In cases in which inmate-plaintiffs exhaust their remedies in the administrative process and continue to pursue their claims in federal court, there is still much to be gained.  The administrative process can serve to create a record for subsequent proceedings, it can be used to help focus and clarify poorly pled or confusing claims, and it forces the prison to justify or explain its internal procedures.  All of these functions help courts navigate the sea of prisoner litigation in a manner that affords a fair hearing to all claims.
>
> Finally, applying § 1997e(a) without exception promotes the efficacy of the administrative process itself, which in our view can be a meaningful and constructive procedure.  Operating at its best, which it admittedly sometimes does not, a prison administrative grievance procedure will afford an inmate with a sense of respect.  If prison officials treat his claims with seriousness and care, they may well discover that he can be easily satisfied. . . . And if the inmate sees his meritorious claims handled with care by his jailers, he is more likely to respect their rules and serve his time in a manner that is as productive as possible.

*Id.* at 76-77 (internal citations, quotation marks, and footnote omitted).

There is no "futility" exception to the PLRA's administrative exhaustion requirement.  *Id.* at 71.  Thus, prisoners "must . . . exhaust administrative remedies even where the relief sought—monetary damages—cannot be granted by the administrative process."  *Woodford*, 548 U.S. at 85 (citing *Booth*, 532 U.S. at 734).

In addition, "the PLRA exhaustion requirement requires proper exhaustion."  *Id.* at 83.  Requiring proper exhaustion "eliminate[s] unwarranted federal-court interference with the administration of prisons, and thus seeks to 'affor[d] corrections officers time and opportunity to address complaints internally before allowing the initiation of a federal case.'"  *Id.* at 93 (quoting *Porter*, 534 U.S. at 525).  "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively

without imposing some orderly structure on the course of its proceedings." *Id.* at 90-91 (footnote omitted). If a prisoner does not properly exhaust his or her administrative remedies, the prisoner cannot file a lawsuit challenging prison conditions in federal court because he or she is procedurally defaulted from doing so. *Spruill v. Gillis*, 372 F.3d 218, 227-29 (3d Cir. 2004); *see Small v. Camden Cnty.*, 728 F.3d 265, 269 (3d Cir. 2013) ("Under the PLRA, exhaustion is a precondition for bringing suit under § 1983.").

A prisoner cannot properly exhaust administrative remedies "by filing an untimely or otherwise procedurally defective administrative grievance or appeal." *Woodford*, 548 U.S. at 83. The prisoner also "may not satisfy the exhaustion requirement after the filing of his complaint." *Wallace v. Miller*, 544 F. App'x 40, 42 (3d Cir. 2013) (citing *Ahmed v. Dragovich*, 297 F.3d 201, 209 & n.9 (3d Cir. 2002) and *Johnson v. Jones*, 340 F.3d 624, 627-28 (8th Cir. 2003)).

If prison officials interfere with or impact the prisoner's filing of a grievance, this interference may serve as an exception to the requirement calling for full and proper exhaustion because it prohibits (or prevents) the availability of the grievance procedure to the inmate. *See Mitchell v. Horn*, 318 F.3d 523, 529 (3d Cir. 2003) ("A grievance procedure is not available even if one exists on paper if the defendant prison officials somehow prevent a prisoner from using it."); *Brown v. Croak*, 312 F.3d 109, 112-13 (3d Cir. 2002) (explaining that "[s]ection 1997e(a) only requires that prisoners exhaust such administrative remedies as are available" and, therefore, if the prisoner-plaintiff was correct that prison officials told him that he needed to wait until the termination of an investigation before he could file a formal claim yet never told him that they had completed the investigation, "the formal grievance proceeding . . . was never available to" the plaintiff (internal quotation marks omitted)). This exception applies to excuse a failure to exhaust "under certain limited circumstances." *Harris v. Armstrong*, 149 F. App'x 58,

59 (3d Cir. 2005).  The prisoner would have to show that he or she "was misled or that there was some extraordinary reason he [or she] was prevented with complying with the statutory mandate."  *Davis v. Warman*, 49 F. App'x 365, 368 (3d Cir. 2005); *see Camp v. Brennan*, 219 F.3d 279, 281 (3d Cir. 2000) (concluding that the plaintiff satisfied section 1997e(a)'s exhaustion requirement where the evidence showed that the Office of Professional Responsibility reviewed the plaintiff's excessive force claim *and* correctional officers told him that his grievances would not reach the grievance coordinator).

Nonetheless,

in the absence of competent proof that an inmate was misled by corrections officials, or some other extraordinary circumstances, inmate requests to excuse a failure to exhaust are frequently rebuffed by the courts.  Thus, an inmate cannot excuse a failure to timely comply with these grievance procedures by simply claiming that her efforts constituted "substantial compliance" with this statutory exhaustion requirement.  *Harris v. Armstrong*, 149 F. App'x 58, 59 (3d Cir. 2005).  Nor can an inmate avoid this exhaustion requirement by merely claiming that the correctional agency policies were not clearly explained to him.  *Davis v. Waxman*, 49 F. App'x 365, 368 (3d Cir. 2002).  Furthermore, an inmate's confusion regarding these grievances procedures does not, standing alone, excuse a failure to exhaust.  *Casey v. Smith*, 71 F. App'x 916 (3d Cir. 2003).  Moreover, an inmate cannot cite to alleged staff impediments to grieving a matter as grounds for excusing a failure to exhaust, if it also appears that the prisoner did not pursue a proper grievance once those impediments were removed. *Oliver v. Moore*, 145 F. App'x 731 (3d Cir. 2005) (failure to exhaust not excused if, after staff allegedly ceased efforts to impede grievance, prisoner failed to follow through on grievance).

*Smith v. Lindsey*, No. 1:13-cv-2914, 2015 WL 1651115, at *7 (M.D. Pa. Apr. 14, 2015).

The "exhaustion of administrative remedies under the PLRA is a question of law to be determined by the judge."  *See Drippe v. Tobelinski*, 604 F.3d 778, 782 (3d Cir. 2010) (agreeing with *Pavey v. Convey*, 544 F.3d 739, 740 (7th Cir. 2008)).  The court must resolve this issue "even if that determination requires the resolution of disputed facts."  *Small*, 728 F.3d at 269 (citing *Drippe*, 604 F.3d at 781).  Also, as the defendants are asserting the affirmative defense of

failure to exhaust administrative remedies, they bear the burden of proving that the plaintiff failed to exhaust his administrative remedies.  *See Brown*, 312 F.3d at 111 ("Failure to exhaust administrative remedies is an affirmative defense that must be pled and proven by the defendant.").

### 3.      Whether the Plaintiff Had to Exhaust Administrative Remedies

As indicated above, the plaintiff contends that the court should conclude that he did not have to exhaust any administrative remedies with respect to his claims in this case.  His first argument in support of his contention that he did not need to exhaust any administrative remedies before filing suit is that his actual complaints relate to "state laws" and, as such, are specifically identified as non-grievable issues under the GPP.[19]  Pl.'s Mem. at 3-4.  This argument is unpersuasive for the following reasons:  In the first instance, the plaintiff incorrectly references what his grievance is, at least insofar as it pertains to this case.  In this regard, the plaintiff states that "the inmates that attacked him violated state laws and were arrested," as such, he would not have had to grieve any issues related to the attack because "the actions that gave rise to Plaintiff's cause of action against the Defendants is founded in state law."  *Id.* at 4.  The plaintiff correctly points out that the inmates' attack upon him seemingly would violate state criminal law (as evidenced by the charges filed against the inmates) or civil law (as such conduct would appear to constitute a civil battery).   Nonetheless, the plaintiff's grievance and, consequently, the basis for this civil action, does not relate to the conduct by these other inmates in assaulting him on November 16, 2012; instead, it relates to ***the correctional officers***' actions in failing to (1) prohibit the assault from happening in the first place, or (2) prevent the assault from escalating once it started.   His allegations relate to the correctional officers' failure to

---

[19] The plaintiff does not contend that any such conduct would not have been grievable under the GPP because it falls under "federal law," so the court has not addressed any such argument here.

follow prison rules and regulations. *See* Complaint at ¶ 14 ("Defendants, Saborsky, March, [and] Nowicki did not attempt to stop the attack because none of them had handcuffs on their person, which was a violation of the prison rules."); *id.* at ¶ 25 (referencing internal procedures for maintaining security and safety of one inmate from another). Thus, while the direct cause of his purported physical injuries was the physical contact by the other inmates, he did not need to complain about the conduct of those inmates in the grievance. Instead, he needed to grieve the correctional officers' conduct in failing to adhere to the no-contact order and in failing to properly protect him, such as by possessing handcuffs to restrain the other inmates, once they began assaulting him.

Secondly, the plaintiff's purported interpretation of this language, namely that a prisoner would not have to grieve any issues that could constitute a violation of federal or state law, is untenable and unreasonable. The interpretation of a prison's grievance policy is a question of law for the court to resolve. *See Spruill v. Gillis*, 372 F.3d 218, 232 (3d Cir. 2004) (citing *Stokes v. District Attorney*, 247 F.3d 539, 540-41 (3d Cir. 2001)).

After reviewing the entirety of the GPP, the court finds that the language "state and federal laws" when included as non-grievable issues, indicates that the Jail is precluding inmates from raising challenges to state and federal laws through the prison grievance process. If the court interpreted the phrase "state and federal laws" in the GPP in accordance with the plaintiff's interpretation and its logical extension, it would necessarily mean that any time that a prisoner wanted to grieve about an alleged unconstitutional violation (as such a violation would seemingly violate "federal law"), the prisoner would not have to file a grievance and could directly proceed to bring an action under 42 U.S.C. § 1983 in federal court. Therefore, Lehigh County would be permitting its inmates to file all of the associated claims that inmates often file

in section 1983 actions, such as claims for excessive force and deliberate indifference to medical needs under the Eighth Amendment, without ever having exhausted their administrative remedies and providing the Jail with the opportunity to investigate the claims and resolve issues before the claims are filed in federal court.  This result would be inconsistent with the purpose and intent of the PLRA.  *See Jones v. Bock*, 549 U.S. 199, 219 (explaining that a purpose of the PLRA's exhaustion requirement is to give prison officials the first opportunity to correct constitutional violations).   Accordingly, even if the phrase "state and federal laws" was ambiguous, the court will not adopt the plaintiff's interpretation of this language in the GPP because it would lead to an unreasonable or absurd result that is inconsistent with the purpose of the PLRA.  *See, e.g.*, *United Steelworkers of Am. v. North Star Steel Co.*, 5 F.3d 39, 42 (3d Cir. 1993) (explaining that a court should avoid interpreting a statute that would lead to an absurd or unreasonable result), *cert. denied*, 510 U.S. 1114 (1994).

For his second argument in support of his claim that he did not need to exhaust any remedies prior to bringing suit, the plaintiff appears to assert that contrary to Sweeney's statement in his affidavit, the Jail staff members' conduct at issue would not have fallen under "staff actions" grievable under the GPP.  Pl.'s Mem. at 4-5.  The plaintiff claims that the Jail's treatment of his grievance relating to the actions by Schraer on December 22, 2012, demonstrates that staff actions were not grievable.  *Id.*  He claims that the Jail should have reviewed the grievance and not mislabeled it as a non-grievable misconduct.  *Id.* at 5.  This argument is also unavailing because (1) the Jail personnel did not "mislabel" the grievance as relating to a misconduct, and (2) the result of that investigation does not excuse the plaintiff of exhausting his remedies with respect to his claims against the defendants or result in a conclusion that "staff actions" were not grievable.

While the court recognizes that this is a tangential issue, the Jail personnel did not mislabel the plaintiff's grievance against Schraer as a misconduct when it was actually a grievable "staff action" issue.  Instead, as properly determined by the Grievance Coordinator and the Warden, the plaintiff's allegations against Schraer were not grievable under the GPP because they pertain to a "misconduct" imposed against him.  The essence of the plaintiff's grievance was that Schraer lied about the circumstances giving rise to the imposition of the misconduct and, as such, he should not have received the misconduct.  The GPP provides that any issues relating to "[m]isconducts/appeals" are not grievable because there is a separate process for addressing those issues.  *See* IGP at 2.  Although the record in this case does not include the Jail's process for resolving those issues, such a process would seemingly have to include resolving allegations of misconduct on their merits if they are disputed by the inmate.  Thus, the issue of whether the plaintiff or Schraer were telling the truth as it relates to the facts underlying the misconduct charge would have to be resolved as part of that process.  Although technically Schraer's act of allegedly lying would constitute "staff action" because Schraer is a member of the Jail's "staff" and lying about something is an "action," this entire grievance relates to the plaintiff's misconduct and does not constitute "staff action" under the GPP.  It would be nonsensical to allow inmates to get around the Jail's process for resolving misconducts by collaterally attacking the allegations in a misconduct charge (including allegations based on observations of Jail personnel) through filing grievances based on "staff action."  In addition, simply because the plaintiff claimed that he was not attacking the merits of the misconduct charge, which is an arguable interpretation of his statements, did not (1) mean he was not actually doing so, or (2) prohibit the Jail staff from interpreting his grievance as complaining about his misconduct charge.  The Jail appears to have properly classified the grievance as a

grievance pertaining to misconduct and not staff action.  Accordingly, the Jail staff appears to have properly addressed this particular formal grievance.

In addition, the Jail staff's handling of the Schraer grievance does not somehow correlate as an excuse for the plaintiff to not file a formal grievance in this case.  The plaintiff asserts that "[i]t could certainly be inferred based upon [the decision denying the grievance] that conduct of prison employees was not considered grievable because the underlying action in that matter was alleged misconduct by the Plaintiff."  Pl.'s Mem. at 5.  As already indicated, the Jail personnel's resolution of the Schraer grievance does not support a conclusion, inference, or even a suggestion that "staff actions" were not grievable at the Jail.  Instead, the only reasonable conclusion (even viewing it in the light most favorable to the plaintiff) is that the plaintiff was attempting to grieve a non-grievable issue.

The GPP provides inmates at the Jail with a grievance procedure and it expressly provides that "staff actions" are grievable issues (either informally or formally).  As indicated by Sweeney, allegations that correctional staff failed to follow a no-contact order or have handcuffs on their persons relate to grievable "staff actions" under the GPP.  Those allegations do not relate to "state and federal law."  Accordingly, the plaintiff's claims fall under the PLRA and under the GPP's grievance policy and the plaintiff was required to follow the GPP to exhaust any administrative remedies.

### 4.    Whether the Plaintiff Exhausted His Administrative Remedies

For purpose of addressing the plaintiff's arguments on whether he exhausted his administrative remedies, the court will first analyze the GPP as a whole because the plaintiff argues that it essentially provides two avenues for grievances and completion of the informal grievance procedure constitutes completion of administrative remedies under the GPP because

there is nothing else for the plaintiff to do at that point.  As explained below, the plaintiff's interpretation of the GPP is illogical and lacks merit.

As noted by the plaintiff, the GPP provides for informal and formal grievances.  *See* IGP at 1-3; Pl.'s Mem. at Ex. K, Handbook, Inmate Guidelines at § 42 (referencing informal and formal grievances).  The GPP states that "[a]n inmate shall attempt to resolve a grievance informally" and if the inmate does not do so, this failure "to resolve an issue informally is grounds for rejecting a formal grievance." IGP at 3.  The inmate can attempt to informally grieve verbally or in writing, but if the inmate grieves in writing, the inmate must use an "Inmate Request to Staff" form.  *Id.*

Although the GPP provides that Jail staff shall "answer written informal grievances within 14 calendar days of receipt[,]" it also states that "[i]f the inmate does not hear back from the staff member, any formal grievance submitted must still meet the submission deadline spelled out below."  *Id.*  Regarding this submission deadline for formal grievances, the GPP states that the inmate must file the formal grievance "so the Grievance Coordinator receives the form no later than 21 calendar days from the event that triggered the grievance."  *Id.*  Thus, the GPP expressly informs inmates that although staff is expected to respond within 14 days of receipt of the written informal grievance, if the inmate were to not receive a response, the inmate must file a formal grievance within 21 days of the date of the incident triggering the grievance.[20] *Id.*

Regarding the interplay between informal and formal grievances, the plaintiff contends that "there is absolutely NOTHING that deals with the denial of an Informal Grievance."  Pl.'s Mem. at 8.  The plaintiff notes that the GPP's provision on grievance appeals deals only with formal grievances or grievance restrictions.  *Id.*  The plaintiff also points out that the GPP

---

[20] The nonresponse provision would appear to apply equally to verbal and written informal grievances.

mentions that an inmate "may" file a formal grievance, "but there is NO requirement that he file a formal grievance following a response from an informal grievance." *Id.*  Because he argues that the GPP does not provide for remedies after a response to an informal grievance, he claims that the GPP did not reasonably communicate to him what his remedies were. *Id.* at 8-10.

The court does not find the plaintiff's interpretation of the GPP to be persuasive.  In particular, the court does not interpret the GPP's use of the word "may" in accordance with the plaintiff's interpretation.  Per the plaintiff's interpretation, an inmate dissatisfied with the result of the resolution of an informal grievance could exhaust remedies because the use of the word "may" means that filing a formal grievance is permissive and not mandatory.  This interpretation would render other language in the GPP meaningless.

If an inmate is dissatisfied with the resolution of an informal grievance, the inmate does not need to do anything in a literal sense.  There is no requirement that an inmate file a formal grievance if the inmate does not wish to pursue the issue further.  The Jail cannot force an inmate to pursue a grievance that the inmate does not want to pursue.  It would be illogical for the Jail to state, "[s]hould the inmate be unable to resolve the grievance informally, he [**shall**] submit a formal grievance."  Instead, the GPP provides an avenue for an inmate if the inmate is unable to resolve the issue and desires to further pursue the matter.[21]

Most importantly, the GPP informs the inmates of the requirements for exhaustion.  It indicates that an inmate "shall exhaust all administrative remedies contained in this policy before filing a civil suit over the grievance." *Id.*  In its totality, the GPP provides that if the inmate files a formal grievance, which the Grievance Coordinator denies, and the inmate then files an appeal to the warden, the decision by the warden concludes the appeal and "administrative remedies

---

[21] Presumably the informal resolution would be adverse to the inmate. If not, the inmate would seemingly have no reason to further pursue the issue.

will have been exhausted."  *Id.* at 3-4.  The GPP does not state that an inmate exhausts any administrative remedies through an unsatisfactory result at the informal grievance level.

The court notes that the plaintiff "agrees that had there been no response by Defendant Prison, then he would have had to file a formal grievance."  Pl.'s Mem. at 8.  So, through the plaintiff's interpretation, if Jail personnel do not respond to an informal grievance the inmate "would have had to," *i.e.* "must" file a formal grievance, yet he would have the court interpret the GPP so if the Jail responds, then the inmate would not have to pursue a formal grievance to complete exhaustion.  Once again, if the Jail personnel respond and give the inmate exactly what he or she wants, there would be no reason to grieve and it is unlikely that a federal court ever gets involved in the case.  If, however, the inmate does not get the relief requested in the informal grievance, there is no practical difference between that scenario and one where the inmate did not receive a response because the result is the same, namely, the inmate is not getting the requested relief.  The GPP's language does not produce such a result and there is simply no rational reason to interpret it as such.

Moreover, the plaintiff's argument that his remedies were not reasonably communicated to him because the GPP "did not provide any remedies for those filing an Informal Grievance to which a response was sent to the [p]risoner" is meritless.  Pl.'s Mem. at 8-10.  Instead, the Jail reasonably communicated a remedy for an inmate that receives a response to an informal grievance to which the inmate does not agree, namely, the inmate may file a formal grievance to further pursue the issue with Jail personnel.

As referenced by the defendants, the court's decision in *Scheeler v. Lehigh County Prison*, No. 13-5739, 2015 WL 573702 (E.D. Pa. Feb. 12, 2015) supports their and this court's interpretation of the GPP with respect to exhaustion of administrative remedies, namely that the

GPP requires the filing and prosecution (through an appeal) of a formal grievance for full exhaustion.[22]  Def.'s Mem. at 8-9.  In *Scheeler*, the Honorable Eduardo C. Robreno analyzed the GPP at issue in the case to address the plaintiff's assertion that he had exhausted his administrative remedies because he addressed any issues informally and a formal or written grievance was not required under the GPP for a claim to be exhausted.  2015 WL 573702 at *4.  As with the plaintiff here, the plaintiff in *Scheeler* focused on "the permissive language of § 3B of the policy," as it references that an inmate "may" submit a formal grievance if the inmate is unable to resolve the issue informally.  *Id.*

In rejecting the plaintiff's argument, Judge Robreno explained that the plaintiff "misapprehends the clear meaning of the provisions relating to exhaustion."  *Id.*  In particular, Judge Robreno pointed out that "the language of Defendant's grievance policy makes clear that a formal written grievance is necessary to the extent an inmate seeks to continue the grievance process (after an informal grievance) and fulfill the exhaustion requirements."  *Id.* at *5.  Judge Robreno also stated as follows:

> The grievance policy expressly states that exhaustion of all administrative remedies is required for a civil action to be brought in federal court (§ 2.H.), and that the policy's procedures must be followed in exhausting said remedies (as laid out in the [policy's] definition of exhaustion).  However, the only other guidance offered on precisely which procedures must be followed to fully exhaust is found in § 6.A., where it states that "[a]t the conclusion of the appeal [of a formal grievance], administrative remedies will have been exhausted."  Unlike this

---

[22] The defendants also rely on *Arnold v. Ayala*, No. 10-7571 (E.D. Pa. Mar. 22, 2012), a case in which the Honorable J. Curtis Joyner reviewed the Jail's inmate grievance policy and interpreted it as follows:

> According to the Lehigh County Prison inmate grievance policy, an ["Inmate's Request to Staff" ("IRS")] is the first step in the grievance procedure, in which a prisoner attempts to resolve the conflict informally.  If this fails to resolve the conflict, the policy requires the inmate to file an "Inmate Formal Grievance" subject to further consideration and potential appeal.

*Ayala*, No. 10-7571 at 1 & n.1.  Judge Joyner then noted that despite being aware of the formal grievance procedure (as evidenced by his submission of three formal grievances in the preceding months on an unrelated incident) the plaintiff never submitted a formal grievance after he received responses to his informal grievances.  *Id.*  As such, Judge Joyner concluded that the plaintiff had failed to exhaust his administrative remedies.

passage, which directly ties exhaustion to the appeal of a formal grievance, exhaustion is never referred to in connection with the informal grievance procedures.  Viewed as a whole, and taken provision by provision, the plain meaning of the policy's language indicates that an inmate is required to carry a grievance all the way through the formal process in order to completely exhaust his administrative remedies.

Plaintiff's argument regarding the policy's "either informally or formally" language is unavailing.  It is true that an inmate may choose to do either, and that an informal grievance may be a prerequisite to a formal grievance.  But there is nothing in the policy that forces an inmate to exhaust administrative remedies, or to take a complaint beyond the informal stage.  This permissive language does not imply that merely making an informal comply fulfills an inmate's obligation to allow the prison the opportunity to fully investigate and address a grievance before it becomes embroiled in litigation.

*Id.* at *5-6.

The plaintiff attempts to distinguish *Scheeler* because he asserts that the plaintiff in *Scheeler* never filed a formal or informal grievance to assert his complaints about his block officer whereas here the plaintiff submitted an informal grievance to which Donate responded. Pl.'s Mem. at 9-10.  The plaintiff incorrectly claims that the plaintiff in *Scheeler* did not pursue informal grievances.  While it is unclear if that plaintiff submitted written informal grievances, he had indicated that he was able to resolve his grievances informally.  *Scheeler*, 2015 WL 573702 at *6.  The plaintiff also must have received responses to those informal grievances as he had "his Bible returned to him, his water/toilet restored by moving him from cell 2 to cell 7, soap and toilet paper provided, and finally [by his] transfer [] back to general population."  *Id.* (citation omitted) (alterations in original).  So, contrary to the plaintiff's assertion, the *Scheeler* plaintiff was similarly-situated to the plaintiff here insofar as he had informally grieved and received a response from prison officials.  Also similarly, neither plaintiff ever filed a timely formal grievance.

Based on this court's review of the entirety of the GPP and the decisions in *Scheeler* and *Ayala*, the plaintiff needed to file a formal grievance and pursue that grievance through an appeal before he exhausted his administrative remedies and commenced this litigation.  His argument in an attempt to distinguish this situation insofar as he filed an informal grievance and received a response from Donate (which the court will discuss below) is unpersuasive and ultimately, unavailing.

While the court's interpretation of the GPP regarding the proper exhaustion of administrative remedies moots the need to discuss the plaintiff's contention that he filed an informal grievance addressing the issues that he raises in this case, for sake of completeness, the court addresses that argument here.  As indicated above, in support of his assertion that he exhausted his administrative remedies, the plaintiff claims that he satisfied the GPP's informal grievance procedure when he filed an informal grievance to which Donate responded.[23]  Pl.'s Mem. at 6.  As indicated above, in his November 30, 2012 informal grievance to Donate, the plaintiff (1) inquires why he is on "A/S status" despite not receiving a misconduct or breaking any facility rules or regulations, (2) indicates that it has been nine days since the "incident in question" and he has not been permitted to contact anyone from outside the Jail, (3) indicates that he has not spoken to anyone about what happened, (4) inquired if he should be speaking to internal affairs, (5) requests to be removed from "A/S" status so he can purchased a stamped

---

[23] Although only briefly referenced and undeveloped in his opposition memorandum, the plaintiff indicated in his answers to requests for admissions that his informal grievance consisted of his being questioned by prison officials and providing them with a statement about what happened.  RFA Answers at ¶ 16; Pl.'s Mem. at 2 ("Plaintiff gave informal notice to the Corrections Officers, prison officials and County Detectives that he was cooperating with[.]").  The plaintiff's interaction with investigators after the assault is also undeveloped in the record.  Nonetheless, even if the court were to interpret this interaction as constituting an informal grievance under the GPP, the court would still conclude that he failed to exhaust for the following reasons:  First, there is no indication that prison officials ever responded to the informal grievance and, as the plaintiff acknowledges, the GPP provides that if an inmate does not receive a response to an informal grievance, he or she must still file a formal grievance within 21 days of the date of the incident (and the plaintiff never filed a formal grievance here).  Second, the plaintiff has not argued that this interaction with prison officials excused him from submitting a formal grievance because the prison officials and investigators affirmatively misled him or otherwise impeded his filing of a formal grievance.

envelope to mail "to someone who cares," and (6) asks for a response as to why the actions mentioned in the grievance "have been taken yet not explained to me."  Pl.'s Mem. at Ex. I, Informal Grievance.  Donate provided a written response this informal grievance on November 27, 2012, in which she (1) indicates that she was unaware that he was "being restricted [and] not using the phone[,] etc.," (2) informed him that she will update his status, and (3) indicated that she does not "know anything about internal affairs."  *Id.*

The issue that is readily apparent from the face of the grievance is whether it would reasonably place the Jail officials on notice of any claims and, if so, the identity of the claims. With regard to the specificity of a grievance, the PLRA does not provide any requirements. *Johnson v. Johnson*, 385 F.3d 503, 516 (5th Cir. 2004) ("Section 1997e(a) does not say how specific a prisoner's administrative grievances must be[.]").  Instead, "[t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."  *Jones v. Bock*, 549 U.S. 199, 218 (2007).  "The primary purpose of a grievance is to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued; the grievance is not a summons and complaint that initiates adversarial litigation." *Johnson v. Johnson*, 385 F.3d 503, 522 (5th Cir. 2004).[24]

---

[24] Despite this recognition by the Fifth Circuit, the court discussed the necessary level of specificity for a grievance as follows:

> a court must interpret the exhaustion requirement in light of its purposes, which include the goal of giving officials time and opportunity to address complaints internally[.] Thus, a grievance should be considered sufficient to the extent that the grievance gives officials a fair opportunity to address the problem that will later form the basis of the lawsuit.  Further, as a practical matter, the amount of information necessarily will likely depend to some degree on the type of problem about which the inmate is complaining.  If an inmate claims that a guard acted improperly, we can assume that the administrators responding to the grievance would want to know—and a prisoner could be expected to provide—details regarding who was involved and when the incident occurred, or at least other available information about the incident that would permit an investigation of the matter.

The court recognizes that the GPP does not provide any guidance in itself, to the necessary requirements or specifics of an informal grievance. In this regard, the definition of an "informal grievance" does not provide any specifics other than to indicate that the inmate must use an "Inmate Request to Staff" form if the inmate chooses to complete a written informal grievance. IGP at 2. The GPP section on "Informal Grievance Submission Procedure" also does not provide any specifics of the necessary contents of a written informal grievance. *Id.* at 3. As for the "Inmate's Request to Staff" form, it requires the inmate to identify the recipient, the grieving party, and the "quarters assignment" of the grieving party. Pl.'s Mem. at Ex. I, Informal Grievance. It then provides numerous lines for the inmate to "[s]tate completely but briefly the problem on which you desire assistance. Give details." *Id.*

Here, even viewing the plaintiff's informal grievance to Donate in the light most favorable to him and giving him every "reasonable" inference therefrom, the court simply cannot find that that document would have placed prison officials (in this case, Donate) on notice that he was raising claims against any correctional officers (or the Jail) relating to what happened to him on November 16, 2012. Instead, his specific claims relate to his desire to be removed from "A/S" and be permitted to contact individuals outside of the Jail. He also asks a specific question about whether anyone from internal affairs will be speaking to him, but he does not state why he should be speaking to internal affairs. While purely speculative, any conversation with internal affairs could be about the incident in general or it could focus on the assault itself. There is simply nothing about that document that would notify prison officials that he was

---

Beyond those general practical considerations, the prison system's own rules regarding grievances provide both inmates and the courts with more specific guidance. Since prisoners are generally required to follow the procedures adopted by the state prison system, the specificity requirement should be interpreted in light of the grievance rules of the particular prison system.

*Johnson*, 385 F.3d at 516-17 (internal citation and quotation marks omitted).

claiming that the correctional officers acted improperly with regard to failing to follow prison policy (as it relates to the no-contact order or the handcuffs issue) or that they otherwise violated his constitutional rights (if he was even aware of such a claim at the time).

In addition, while unclear if he is attempting to do so, the plaintiff may not group the entirety of the Jail's investigation of the November 16, 2012 incident to buttress the lack of reference to the incident in the informal grievance. Even if he could argue that the court should consider the investigation along with the grievance, the investigative reports do not specifically reference any claims of identified misconduct by the Jail staff. The plaintiff attached copies of the misconduct reports filed against the assaulting inmates and none of those reports contain any identified misconduct or wrongful acts by the correctional officers. Pl.'s Mem. at Ex. G. Instead, they describe what happened and what the correctional officers did to attempt to stop the assault. *Id.* Even the incident report by Saborsky, which also contains a recitation of what happened once he arrived at the scene of the assault, does not contain any references to improper conduct by the correctional officers other than his passing reference that the plaintiff told him that the Diaz "was listed as his enemy which led to the assault." Pl.'s Mem. at Ex. H, Incident Report. Further, although the plaintiff attaches copies of e-mails exchanged by Knappenberger, who is identified as an "Internal Affairs Investigator," it is purely speculative that any such investigation pertained to claims by the plaintiff that the correctional officers acted improperly under the Jail's rules and regulations or violated his rights. In fact, the reasonable inference from these e-mails is that the investigation was related to criminal charges against the other inmates, and this is evidenced by his (1) reference to an investigation into the plaintiff's assault, but with a notation that the investigation usually does not commence until the inmate files a private criminal complaint, and (2) request to Edward Ressler to "give [them] a 'heads up' when [he]

make[s] an arrest(s) in the Shumanis investigation to allow Director Sweeney to be prepared for any press inquiries." Pl.'s Mem. at Ex. J, Incident Report. The fact that Knappenberger was seeking to view a video of the incident also does not support a reasonable inference that he was investigating the conduct of the correctional officers involved. Even viewing these documents in the light most favorable to the plaintiff, the court cannot reasonably infer from these documents that the Jail was on notice as to claims by the plaintiff against the correctional officers present during the assault. Moreover, even if the plaintiff could combine all of these documents relating to an investigation into the informal grievance, he still did not file a formal grievance after receiving a response from Donate and Donate's response did not provide him with any relief at least as it pertains to the claims in this case.

Although the court recognizes that the court must view the evidence in the light most favorable to the plaintiff as the non-moving party, and give him the benefit of reasonable inferences, the court cannot even reasonably infer that this informal grievance related to allegations of improper conduct by correctional officers or the Jail. Therefore, the plaintiff did not submit an informal grievance as contemplated by the GPP at least insofar as he has claimed that correctional officers and the Jail failed to comply with the no-contact order and the correctional officers lacked handcuffs to prevent the assault. Even if somehow the court were to conclude that this constituted a proper informal grievance (or the totality of the investigation with this grievance constituted a proper informal grievance under the GPP), the bottom line is that the plaintiff never filed a formal grievance after receiving Donate's response and Donate's response did not provide him with any relief at least as it pertains to the allegations in this case.

35

### III.    CONCLUSION

The court recognizes that it appears to be undisputed that on November 16, 2012, the plaintiff was the victim of a horrible assault by three other inmates in the Jail and he was injured as a result of the assault.  The plaintiff alleges that he was assaulted by these inmates even though the Jail had a no-contact order in place to prevent him and one of those other inmates from being in the same location.  He also alleges that the correctional officers lacked handcuffs on their persons resulting in their inability to restrain the other inmates as they were assaulting him.  While the record has not been developed to determine whether the plaintiff could ultimately prove any constitutional violations by the defendants, if the plaintiff's allegations are true, he had a valid reason to commence this litigation.

Nonetheless, the plaintiff admits he was aware of the grievance policy at the Jail and this is further evidenced by him filing at least one informal grievance (even though he was in "A/S") and three formal grievances in the month prior to the assault and the month after the assault.  For one of those formal grievances that he filed in the month after the assault, he appears to have prosecuted it through an appeal to the warden (although he was ultimately unsuccessful).  Even if the plaintiff did not have a copy of the GPP, a fact that he does not argue about in his opposition memorandum, these grievances evidence his knowledge of the grievance procedure at the Jail and the remedies available to him.

The GPP, taken as a whole, provides that for an inmate to exhaust administrative remedies with respect to a particular issue, the inmate must proceed from an informal grievance (verbal or written), to filing a formal grievance and, presuming that the Grievance Coordinator denies the formal grievance, to filing an appeal to the Warden.  Contrary to the plaintiff's assertion, the GPP provides an available remedy for inmates receiving an unfavorable resolution

36

of an informal grievance; namely, they may file a formal grievance with the Grievance Coordinator if they desire to further pursue the issue.

Although the plaintiff claims that he filed an informal grievance with respect to his claims in this case, the record, despite the court giving the plaintiff the benefit of any and every reasonable inference, simply does not reflect that he filed any such informal grievance that would have placed the defendants on notice of his claims in this case. Even if the court could possibly interpret his informal grievance to Donate as relating to his claims against the defendants in this case, at best he received no response with respect to these claims or her response possibly constituted a denial insofar as Donate indicated that she did not know anything about internal affairs. For either of these outcomes, the GPP provided that the plaintiff needed to file a formal grievance within 21 days of the incident if he intended to pursue his claim. The plaintiff admits that he failed to do so.[25]

Accordingly, the defendants have satisfied their burden to demonstrate that the plaintiff failed to exhaust his administrative remedies at the GPP prior to commencing this litigation and the court will grant their motion and enter summary judgment in their favor and against the plaintiff.

A separate order follows.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.

---

[25] Although not specifically addressed earlier in this opinion, neither the plaintiff's attorney's Notice Pursuant to 42 Pa.C.S. § 5522, submitted more than a month after the incident, nor his letter to Detective Ressler, would constitute a proper grievance under the GPP. As such, they would not warrant a different conclusion in this case because they were submitted after the time for filing a formal grievance (and not in accord with the GPP).